The Brush-Moore Newspapers, Inc. v. Commissioner.
Brush-Moore Newspapers, Inc. v. Commissioner
Docket No. 8536.
United States Tax Court
1946 Tax Ct. Memo LEXIS 23; 5 T.C.M. (CCH) 1014; T.C.M. (RIA) 46280; December 4, 1946
William H. Vodrey, Esq., 517 Broadway, East Liverpool, Ohio, for the petitioner. C. E. Price, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case involves deficiencies in income tax for 1941 in the *25 amount of $6,834.09, and in excess profits taxes for 1940 and 1941 totaling $29,692.92. Two separate questions are presented for decision. The first is whether the sum of $22,504.12 paid by petitioner in 1941 to the trustee of a pension trust is deductible as a business expense under section 23 (a) (1) of the Internal Revenue Code or as an amount transferred or paid into a pension trust within the meaning of section 23 (p) of the Code. The second is whether certain gain allegedly realized by petitioner in 1940 should be included in its excess profits net income for that year. This second question requires consideration of whether this gain is excludible from petitioner's 1940 excess profits net income under section 711 (a) (1) (B) of the Code as amended by the Revenue Act of 1942, and, if not so excluded, whether this gain was abnormal and attributable to some year other than 1940 within the meaning of section 721 of the Code as amended by the Revenue Act of 1941. Petitioner's tax returns for the years here in question were filed with the collector of internal revenue for the 18th district of Ohio at Cleveland. Petitioner is an Ohio corporation, incorporated *26 in 1927, which publishes daily newspapers in six Ohio cities and one Maryland city. Its principal office is located in Canton, Ohio. On December 30, 1941, petitioner's board of directors adopted a resolution that a pension plan should be established on that day for the benefit of some of petitioner's employees. Copies of the plan were distributed on December 31, 1941, to the employees covered by it and each of them elected on that day to participate in it. The pension plan stated, as did the resolution, that it was being established for the exclusive benefit of some of petitioner's employees and that it was solely designed and should be applied to provide for the livelihood of such employees upon their retirement from employment. The material provisions of the plan are as follows: 1. TRUST. The First National Bank of East Liverpool, Ohio, is the Trustee of a Pension Fund which is formed and shall be availed of solely to aid in the proper execution of the Pension Plan and this Trust is created for the exclusive benefit of such employees. The Trust agreement provides that it shall be impossible, at any time prior to the satisfaction of all liabilities with respect to employees *27 under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of the employees. The Trustee shall manage the Pension Fund in accordance with written directions of the Pension Committee. The Trustee shall invest the Pension Fund as the Pension Committee may direct in writing. The contributions of the Beneficiaries shall be invested in investments provided by law for trustees. The contributions of the Company shall be invested in the securities of the Company, if available, including any bonds or other debts or obligations or shares of the Company; and if securities of the Company are not available, the contributions of the Company shall be invested as the Pension Committee may direct. which shall not be limited to the investments provided by law for trustees. The initial contribution of $50,000 made by the Company to the Fund shall be invested in preferred shares of the Company, and for such purpose the Company agrees to sell to the Fund 500 preferred shares, now held in the Treasury of the Company, at $100 per share. 2. CONTRIBUTIONS. Each Beneficiary of the Pension *28 Plan shall contribute monthly to the Pension Fund Three per centum (3%) of his salary. This employees' contribution shall be deducted by the Company from the Beneficiary's salary and the amount deducted shall be paid by the Company to the Trustee as the Beneficiary's contribution. The first contribution by the Beneficiary shall be paid January 15, 1942. The Company shall pay to the Trustee the balance of the cost of the Pension Plan. The Treasurer of the Company has paid the Trustee $50,000.00 as the initial contribution to the Trust by the company. This amount is the pension liability applicable to the year 1941 for pensions to be paid in the future. 3. PENSION COMMITTEE. A Pension Committee shall administer the Pension Plan. The Committee shall make such rules as may be necessary to carry out the provisions of the Plan and shall determine conclusively for all parties all questions arising in the administration of the Plan. The Committee shall have six members, three of whom always shall be elected by the Board of Directors of the Company, and hold office until removed by the Board. The other three members shall initially be elected by the Directors from among the Beneficiaries *29 and these three members shall hold office until removed by the affirmative vote of a majority of the Beneficiaries at the time. Any vacancy among the three members of the Committee who are beneficiaries shall be filed by the vote of a majority of the Beneficiaries at the time. A majority of the Committee shall constitute a quorum at all meetings of the Committee, and all decisions of the Committee shall be by the affirmative vote of a majority of the Committee. * * * 4. BENEFICIARIES. The Beneficiaries of the Pension Plan shall include such employees of the Company as may be designated from time to time by the Board of Directors of the Company. All Beneficiaries at the time of their designation shall be at least aged forty, and receiving a salary of not less than $5,000 per year from the Company. Any person voluntarily leaving the employ of the Company shall cease to be a Beneficiary and any Beneficiary may voluntarily withdraw from participation in the Pension Plan. If any Beneficiary, without the permission of the Company, shall take other employment or engage in other activity which in the opinion of the Pension Committee is inimical to the Company's interests, the Committee *30 shall remove such person as a Beneficiary. 5. PENSION. All Beneficiaries of the Pension Plan shall retire from active employment by the Company at age sixty-five, and by action of the Board of Directors of the Company may be retired at any time before age sixty-five. Upon retirement each Beneficiary shall receive a monthly pension, during the life of the Beneficiary, in the amount of one-half his maximum monthly salary during participation in the Plan, but no pension shall exceed $500 per month. The amount of any Pension may be decreased at any time by the Pension Committee, if the Fund should prove inadequate. All Pensions shall be paid from the earnings and principal of the Fund. Upon the death of a Beneficiary or when a person ceases to be a Beneficiary as herein provided, or the termination of this Plan, such Beneficiary or his estate shall be repaid an amount equal to his own contributions plus interest at the rate of Two percent (2%) per annum, not compounded, less the total amount of pension paid to such Beneficiary. If a Beneficiary is incapable of personally receiving the Pension, the Committee may direct that payment be made to any third person on behalf of a Beneficiary. *31 If a Beneficiary shall become bankrupt or attempt to assign his Pension, or if attempt is made to subject the Pension to levy of any kind, then such Pension, in the discretion of the Committee, shall cease. And the Committee may direct payment to any person on behalf of the Beneficiary. 6. AMENDMENTS. The Company hopes to continue this Pension Plan indefinitely and to make further annual payments to the Fund. But the Company reserves the right to change or discontinue the Pension Plan at any time by action of its Board of Directors. No Beneficiary shall have any vested rights in this Plan except as herein provided. No amendment shall change the provisions of the Trust Instrument prohibiting diversion of the Trust Fund, as provided above, and no amendments shall change the rights of a Beneficiary as provided above. The Trust Agreement between the petitioner and the First National Bank of East Liverpool, which was executed on December 31, 1941, provided in part as follows: * * *
The Company [the petitioner] has established a pension plan for the exclusive benefit of some of its employees, a copy of which is hereto attached and made a part of this agreement. The Company *32 has paid the Trustee the sum of Fifty Thousand Dollars ($50,000) to establish a pension fund and the Company and beneficiaries of the pension plan may hereafter from time to time make further payments to the Trustee for this fund. 1. The Trustee shall hold the fund in trust to manage, invest, re-invest and make payments therefrom in accordance with the written directions of the pension committee established by the plan. The Trustee acting in accordance with such directions shall not be responsible for the administration of the plan, for the correctness of any payments from the fund, for the adequacy of the fund for the purposes for which it is established or for the kind of securities that may constitute the fund. 2. At no time prior to the satisfaction of all liabilities with respect to employees under the trust shall any part of the corpus or income of the trust be used for, or diverted to, purposes other than for the exclusive benefit of such employees, whether by operation or natural termination of the trust, by power of revocation or amendment, by the happening of a contingency, by collateral arrangement, or by any other means. * * *
5. The Trustee may resign at any *33 time upon Thirty (30) days' notice in writing to the Company. The Trustee may be removed by the Company at any time upon Thirty (30) days notice in writing to the Trustee. 6. This instrument may be cancelled or amended at any time by the Company upon Thirty (30) days notice in writing to the Trustee. No cancellation or amendment shall affect the prohibition against diversion of the trust fund as heretofore stated. 7. This agreement shall be for the benefit of and bind the Company and the Trustee and their respective successors. On December 31, 1941, the pension committee held its first meeting and gave the trustee directions concerning the investment of the pension fund. The beneficiaries of the pension plan were eleven key executives of the petitioner who were essential to its business. It would have been very difficult, if not impossible, to replace them, particularly at that time. The compensation of the group had not been changed for about four years and it was necessary to make material salary adjustments with respect to these men. In addition, the company desired to provide security for them in order to make their continued service with it attractive and secure. Five *34 of the beneficiaries were business managers of newspapers owned by petitioner. Each business manager was the top executive officer of his nespaper and operated that newspaper with almost complete autonomy of the home office at Canton. One of the beneficiaries was the editor of one of petitioner's newspapers and as such was responsible for all of the contents of the newspaper. The editors of the petitioner's other newspapers were younger than the age required for participation in the pension plan. The remaining five beneficiaries were executives at the petitioner's principal office. The names, positions, years of birth, years of service, and compensation of the eleven beneficiaries are as follows: Total
Years
Company's
compen-
of
Total
contribu-
sation
Service
compensa-
tion under
and
Year
on
tion paid
plan as
Pension
of
Dec. 31,
during
fixed by
contribu-
Name
Position
Birth
1941
year
actuary
tion
Hawley, R. W.
Bus. Mgr.,
Salem
1888
20
$ 5,454.17
$ 1,760.39
$7,214.56
Hughes, C. V.
Bus. Mgr., E.
Liverpool
1897
19
6,537.50
1,016.25
7,553.75
Woods, J. C.
Bus. Mgr.,
Marion
1888
37
7,837.50
2,841.60
10,679.10
Long, J. D.
Bus. Mgr.,
Steubenville
1897
25
6,862.50
987.79
7,850.29
Worstall, N. E.
Editor,
Steubenville
1888
37
7,187.50
2,323.75
9,511.25
Babb, W. J.
Classified
Adv. Mgr.,
Canton
1901
9
5,670.83
654.13
6,324.96
Fletcher, R. F.
Bus. Mgr.,
Portsmouth
1895
16
8,487.50
1,430.33
9,917.83
Schaffner, H. R.
Bus. Mgr.,
Brush-Moore
1888
33
13,037.50
4,225.00
17,262.50
Raridan, J. D.
Editorial
Director and
1892
14
13,037.50
3,114.00
16,151.50
Corporate
Director,
Brush-Moore.
Troxell, J. R.
Auditor and
Director,
Brush-
1896
14
13,037.50
2,200.50
15,238.00
Moore.
Grimes, E. M.
Circulation
Director,
Brush-
1894
14
9,787.50
1,950.38
11,737.88
Moore.
Totals
$96,937.50
$22,504.12
$119,441.62
*35 None of the beneficiaries was an officer of the petitioner during the taxable years. The petitioner had seven directors of which two, J. R. Raridan and J. R. Troxell, were beneficiaries of the pension plan. J. R. Troxell was employed as auditor of petitioner. The total compensation plus the company's pension contribution, shown above, represents, in the case of each beneficiary, an amount equivalent to reasonable compensation to that individual for personal services actually rendered in the year 1941. In 1941 the company had about 660 employees, of which about 340 were earning wages as distinguished from salaries. The wage earners consisted almost entirely of unionized workers in the mechanical departments of the newspapers, who through collective bargaining had had regular increases in their wages. These wage earners also had for many years previous to 1941 certain arrangements in their unions for pensions and the company had a policy of matching the union pension. For these reasons the wage earners were not included in the 1941 or subsequent pension plans. About 310 salaried employees of the petitioner were not included in the plan. These employees had had increases in their *36 salaries from time to time and the company considered that the establishment of a pension plan for this group was not immediately pressing. Moreover, establishing a pension plan for salaried employees was in the nature of an experiment for the company and it decided to start such a program with only a limited group. In years subsequent to 1941 the plan was extended to cover all salaried employees who were 30 years of age and had been employed by the company for five years. At the end of 1945 the pension plan included 139 salaried employees. Petitioner originally calculated $50,000 as the pension payment necessary for 1941 and paid this amount to the trustee. An actuary subsequently computed the amount of petitioner's contribution attributable to 1941 as being $22,504.12, allocated as shown above. The outstanding capital stock of petitioner consists of 50,000 common (voting) shares and 20,000 preferred (non-voting) shares. The common stock is owned by Louis H. Brush, Roy D. Moore, William H. Vodrey, by their families and by two other individuals. These common shares, which are the voting shares, are not controlled by any one individual or family, are not listed on any stock exchange *37 and are not held by the general public. The preferred shares are not listed on any stock exchange but are owned by the general public. No individual or family controls the preferred shares. Most of the beneficiaries of the 1941 pension plan own small quantities of the preferred shares, the total amount held by all of them being 465 shares. On March 8, 1944, the board of directors of the petitioner adopted the following resolution: WHEREAS, The Brush-Moore Newspapers, Inc. has had in effect ever since December 30, 1941, a Pension Plan and Pension Trust, NOW, THEREFORE, be it resolved that no part of said Pension Funds shall ever revert to or become or be the property of the Company, except such balance in the Trust as is due to erroneous actuarial computations during the previous life of the Trust; and this construction, when said Pension Plan and Pension Trust were entered into and created, then was, now is and always has been the intent and meaning of said Pension Plan and Pension Trust. The 1941 plan was amended in December 1943 and December 1944. The trust agreement of December 31, 1941 has itself never been otherwise amended or altered. On December 28, 1944, petitioner *38 was advised by the Commissioner of Internal Revenue, the respondent, that "* * * the plan as amended meets the requirements of section 165 (a) of the Internal Revenue Code, as amended, and that the trust as established thereunder, is entitled to exemption under the provisions of that section." In 1945, six persons who were included in the pension plan after 1941 resigned from employment with the company and received payments out of the fund. No beneficiaries of the plan have been discharged by the company since the plan was instituted in 1941. In December, 1930, Louis H. Brush, Roy D. Moore and William H. Vodrey, the principal shareholders of the petitioner, purchased a newspaper in Lorain, Ohio, and a newspaper in Mansfield, Ohio, from R. C. Hoiles. At the end of 1931 and the beginning of 1932, all of the shares of the two corporations owning these properties were transferred by Brush, Moore and Vodrey to the petitioner, in consideration of the petitioner's assuming the purchase price. The Lorain and Mansfield newspapers each operated in competition with another newspaper in the same town. These competing newspapers, the Mansfield Journal Company and *39 the Lorain Journal Company, were owned by S. A. Horvitz. Both petitioner's and Horvitz's newspapers lost considerable money in 1931 and 1932. Representatives of petitioner and Horvitz discussed the situation and concluded that two newspapers could not be profitably operated in respective towns. Petitioner was willing to purchase Horvitz's properties or to sell its Lorain and Mansfield newspapers to him. In December, 1932, petitioner's Lorain and Mansfield subsidiaries transferred their respective newspapers to the competing newspapers in those towns owned by Horvitz. The property transferred consisted only of personal property. The subsidiaries received as the sales price $30 in cash and notes of the Lorain Journal Company and the Mansfield Journal Company. Petitioner's subsidiaries were then liquidated and the notes were received by petitioner in liquidation. These notes were eight in number, each in the principal amount of $100,000, totaling $800,000. The notes were numbered from one to eight and were registered with The Central National Bank of Cleveland as trustee. They were secured by a pledge of the common stock of the purchasers and by a trust indenture with the same bank *40 as trustee. The notes bore interest at the rate of 6 percent and were due in eight years, or December 27, 1940. No payments were made on the notes except for a small sum which was paid at some undisclosed time when some of the collateral, certain machinery, was sold. On August 12, 1940, a supplemental indenture was executed between the petitioner, the Lorain Journal Company, the Mansfield Journal Company and the trustee bank, whereby the maturity of the notes was extended for eight more years, to 1948, with payments of principal and interest to be made each month in the amount of $10,000, and the interest rate was reduced from 6 percent to 5 percent. The supplemental indenture provided, inter alia, as follows: (1) The Companies [Lorain Journal Co. and Mansfield Journal Co.] and the Trustee are parties to an indenture dated December 19, 1932 (called the Indenture) securing notes of the Companies originally in the amount of $800,000 and now to be reduced to $750,000 (called Notes), owned by the Noteholder [petitioner]. The Shareholders are the owners of all the shares of the Companies, and all the shares of the Companies are pledged under the Indenture. This Supplemental Indenture *41 is executed to further secure the payment of the Notes. (2) The Companies and the Noteholders have amended the Notes by the following writing placed on the back of each of the Notes: "Cleveland, Ohio, August 12, 1940. "The Lorain Journal Company and Mansfield Journal Company, jointly and severally promise to pay the principal of a series of eight notes of which this note is one, with interest from August 12, 1940, at the rate of 5% per annum, in monthly installments of $10,000, commencing October 31, 1940. The monthly installments of $10,000 shall be applied first to interest on all the notes of the series and the balance to principal of the notes in numerical order, beginning with Note Number 1. Any one or more, or all such installments on said notes may be anticipated at any time without prior notice and without premium, and all anticipated installments at the option of the Companies may be applied in lieu of succeeding installments as they fall due. But in any event the entire balance of said principal and interest shall be payable on or before April 1, 1948. These notes are secured by an indenture dated December 19, 1932, and a supplemental indenture dated August 12, 1940. *42 THE LORAIN JOURNAL COMPANY, BY I. Horvitz, President F. D. Davis, Secretary
MANSFIELD JOURNAL COMPANY, BY I. Horvitz, President F. D. Davis, Secretary
(3) The Companies have executed and delivered to the Trustee real mortgages and supplemental chattel mortgages conveying to the Trustee all real estate and chattels of the Companies located in Lorain and Mansfield, Ohio, as described in said mortgages, as security for the payment of the Notes. The financial position of petitioner in 1932 was such that it would have welcomed full cash payment of the purchase price by Horvitz's newspapers; but the purchasers were unable to make such payment. The notes here in question were not held by petitioner primarily for sale to customers in the ordinary course of its trade or business, nor did petitioner engage in the business of purchasing newspapers for the purpose of resale. In its income tax return for 1932 petitioner did not report any gain from the liquidation of its Lorain and Mansfield subsidiaries. The Revenue Agent's report for 1932, with which petitioner agreed, stated that the notes apparently had no value at that time and that no profit was being set up in the year 1932. *43 The report went on to state that the eventual profit to be realized by petitioner upon the payment of the notes amounted to $100,794.44. In January 1942 petitioner was advised by representatives of the respondent that petitioner owed additional normal income tax for 1940 because profit of $100,794.44 of the Lorain-Mansfield notes had been realized in that year. Petitioner executed a waiver of restrictions on assessment and collection of the additional tax, which amounted to $25,775.07, and paid the tax on February 28, 1942. Upon payment of the additional tax of $25,775.07, an overassessment of income tax for 1940 in the amount of $288 resulted, which overassessment will be taken into consideration, insofar as may be necessary, in the Rule 50 computation hereunder. Petitioner's excess profits net income for the taxable years ended December 31, 1940 and 1941 has been computed under the income credit method. Respondent has determined that petitioner should have included the sum of $100,794.44, mentioned above, in the computation of excess profits net income for 1940. Upon including this amount in 1940 excess profits net income, respondent determined that petitioner had a deficiency *44 of $273.41 in excess profits tax for that year. In its computation of excess profits tax for 1941, petitioner claimed an excess profits credit carry-over in the amount of $23,256.25; this carry-over was disallowed by respondent since it had determined an excess profits net income for 1940 in excess of the excess profits credit for that year. By reason of the disallowance of the excess profits credit carry-over, respondent has determined the deficiency of $29,419.51 in petitioner's excess profits tax return for 1941. Petitioner now contends that it should be allowed an excess profits credit carry-over for 1941 in the amount of $41,046.50. In the computation of petitioner's income taxes for 1940 and 1941 respondent disallowed a deduction for capital stock tax in 1941 and allowed the deduction in 1940. Respondent has conceded error in this issue and effect will be given thereto under the Rule 50 computation. Respondent has determined a deficiency of $6,834.09 in petitioner's income tax for the calendar year 1941. This deficiency is predicated upon the disallowance of the capital stock tax deduction mentioned above and upon respondent's determination that petitioner's pension trust *45 contribution of $50,000 in 1941 was not allowable under section 23 of the Internal Revenue Code. Opinion KERN, Judge: The first question for decision is whether the amount of $22,504.12 paid by petitioner in 1941 to the trustee of the pension fund is deductible as a business expense under section 23 (a) (1) of the Internal Revenue Code or as an amount transferred or paid into a pension trust within the meaning of section 23 (p) of the Code. Under section 23 (a) (1) all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for services actually rendered, are deductible in the computation of net income. This section has been construed by the court in Lincoln Electric Co., 6 T.C. 37, 47, wherein we stated: To be allowable as deductions of compensation, amounts paid to officers and employees for services must be compensation for services actually rendered * * *. Undoubtedly, * * * the word "paid" used *46 in the first clause of section 23 (a) * * * in connection with "expenses" in which "salaries or other compensation" are later included, must be treated as applying also to "salaries or other compensation." * * *
What is meant in the statute by the expression "compensation [paid]"? Is that term of such little meaning there that it is satisfied by a showing of mere disbursement by the employer? We think not. "Compensation" is defined in Webster's New International Dictionary, as, inter alia, the "Act or principle of compensating." Thus, there is an inference from the use of that word that there must be receipt of the payment by the employee before that payment can be said to constitute "compensation." * * * This inference is emphasized by the use of the additional word "paid". "Paid" to whom? We think that the use of the combined terms "compensation" and "paid" could mean only "paid to the employee." * * *. As we have heretofore pointed out the salary paid to each beneficiary of the pension plan in 1941 plus the amount of petitioner's contribution to the pension fund attributable to that beneficiary was reasonable compensation to that beneficiary for services actually rendered *47 in 1941. However, was petitioner's contribution to the Fund in 1941 actually "compensation [paid]"? We think not. In Gisholt Machine Company, 4 T.C. 699, 706, we stated: No deduction may be allowed of amounts which have merely been entered by an employer in a reserve account for pensions or profit-sharing and have not been completely transferred by the employer to a trust beyond the possibility of recapture. The trust instrument here involved contains the following powerfully phrased statement: 2. At no time prior to the satisfaction of all liabilities with respect to employees under the trust shall any part of the corpus or income of the trust be used for, or diverted to, purposes other than for the exclusive benefit of such employees, whether by operation or natural termination of the trust, by power of revocation or amendment, by the happening of a contingency, by collateral arrangement, or by any other means. The pension plan contains similar language. However, these provisions must be construed in the light of the entire plan and trust agreement. What are the *48 liabilities with respect to employees which must be satisfied before the corpus or income of the trust can be diverted to purposes other than for the exclusive benefit of the employees? The answer is found in the language of the plan itself, to wit: Upon the death of a Beneficiary or when a person ceases to be a Beneficiary as herein provided, or the termination of this Plan, such Beneficiary or his estate shall be repaid an amount equal to his own contributions plus interest at the rate of Two per cent (2%) per annum, not compounded, less the total amount of pension paid to such Beneficiary. Under the plan any person leaving the employ of the petitioner ceases to be a beneficiary. The pension committee can also oust a beneficiary from participation in the plan under certain conditions. The death of a beneficiary before or after he becomes eligible to receive a pension, terminates all rights of that beneficiary or his estate to receive the pension. Even if we assume that all of these contingencies, including death, are within the control of the beneficiary, it cannot be said that petitioner's contribution to the fund was beyond its control. Cf. Oxford Institute, 33 B.T.A. 1136. *49 The petitioner here reserved the right to change or discontinue the pension plan at any time by action of its board of directors. No beneficiary had any vested rights in the plan except as provided in the plan. The vested right of each beneficiary was merely that he or his estate should recover his own contributions plus nominal interest upon his death, his separation from participation in the plan, or the termination of the plan. Once the beneficiary's contributions were thus repaid, all liabilities to that beneficiary were satisfied. Indeed under the language of the plan, quoted immediately above, it appears that the plan could be terminated even after a beneficiary began to receive a pension, in which event the beneficiary would receive his own contributions plus interest "less the total amount of pension paid to such Beneficiary." The payment of a pension to a beneficiary was conditioned in each case upon the employee remaining in the service of the petitioner until age 65. Even if we assume that the beneficiary obtained a vested interest in the trust fund upon reaching that age, that interest was subject to being divested upon the termination of the pension plan by the action *50 of petitioner's board of directors. As we stated in Lincoln Electric Co., supra, 54: * * * to be deductible as "compensation [paid]," under the applicable section, [section 23(a)] the payments must be more than merely irrevocable by the employer. The employer can not retain the substance and grant only the shadow. The benefit to the employee, when such disbursements are made, must be less illusory and more certainly tangible and definite than those here in dispute. Congress has not said that such disbursements are deductible merely because they are praiseworthy. See also Chapman Chevrolet Co., Inc., 7 T.C. 428, and compare South Texas Commercial Natl. Bank of Houston, 7 T.C. No. 91. Indeed it might be said that the petitioner's case here is not even as strong as that of the taxpayer in Lincoln Electric Co. for there the taxpayer could not recapture the trust fund whereas here the petitioner could, as we have shown, regain its 1941 contribution. Here, if we may borrow language from recent Supreme Court opinions in the estate tax field, the petitioner *51 "retained a string" attached to all of its 1941 contribution to the pension fund. Philips H. Lord, 1 T.C. 286 and Gisholt Machine Co., supra, relied upon by the petitioner, are not determinative of the issue here before us for in neither of those cases did the taxpayer retain a string whereby it might recover its contribution to the pension fund as did petitioner here. Petitioner contends, in the alternative, that it should be permitted to deduct its 1941 contribution to the pension fund under the provisions of section 23 (p) of the Internal Revenue Code and the applicable regulations. [1] We have already pointed out that the petitioner retained the power to recapture its 1941 contribution to the pension fund. It follows, therefore, that the trust does not qualify as an exempt employees' trust under section 165 of the Code and the provisions of Regulations 103 applicable to that section. Since the trust is not exempt from tax under section 165, petitioner's contributions to it in 1941 are not deductible under section 23(p). *52 Petitioner has introduced certain evidence that the Commissioner of Internal Revenue, the respondent, ruled on December 28, 1944, that the trust here in question was exempt from taxation under the provisions of section 165 (a) of the Internal Revenue Code, as amended. Without passing on the materiality of this ruling, it may be pointed out that, although the original trust indenture itself has never been amended, the plan which was specifically made a part thereof was amended after that date. The Commissioner's ruling applied to the trust "which forms a part of your [petitioner's] employees pension plan." The plan to which the Commissioner referred was clearly the amended plan and not the original plan of December 30, 1941. We are here called upon to determine the deductibility of petitioner's 1941 contribution to the pension fund, and are limited to construing the plan and trust agreement as they read in 1941. Our inquiry in the present case cannot be predicated upon the nature and language of the plan and trust agreement in years subsequent to 1941. Respondent's determination that no part of petitioner's contribution to the pension fund in 1941 is deductible *53 under sections 23(a) or 23(p) of the Internal Revenue Code is sustained. The second question for determination is whether the sum of $100,794.44, the profit allegedly realized in 1940 from the Lorain-Mansfield transaction, should be included in petitioner's excess profits net income for 1940. Petitioner contends that the Lorain-Mansfield profit of $100,794.44 should be excluded from its excess-profits net income for 1940 as a long-term capital gain under section 711(a)(1)(B) of the Internal Revenue Code, as amended by section 208 of the Revenue Act of 1942. In the alternative, petitioner asserts that any gain from the Lorain-Mansfield transaction in 1940 was abnormal and attributable to 1932 under section 721 of the Internal Revenue Code as amended by the Revenue Act of 1941 and under sections 30.721-1 and 30.721-3 of Regulations 109 as amended by T.D. 5045 [1941-1 CB 69]. Because of the peculiarities incident to the treatment by both parties of the tax consequences of the entire transaction, we think it advisable to set out a summary of the facts and, in greater detail, a review of the manner *54 in which they were treated by the parties for tax purposes. In 1932 petitioner was the owner of all the stock of two corporations, one of which owned a newspaper in Mansfield, Ohio, and the other, an newspaper in Lorain, Ohio. This stock petitioner acquired, according to the stipulation of facts, "at the end of 1931 and the beginning of 1932." The subsidiaries acquired these newspapers sometime between December, 1930, and the end of 1931. In December, 1932, the subsidiary corporation sold their newspapers to two corporations owned by one Horvitz, receiving as consideration therefor a recited $30 in cash and registered notes of the purchasers in the total principal amount of $800,000 due in eight years, bearing 6% interest, and secured by a pledge of the purchasers common stock. Thereupon the petitioner's subsidiaries were liquidated, the liquidation being completed in 1933. The record does not show the exact date of either the commencement or completion of the liquidation. As a consequence of the liquidation petitioner received the notes owned by the two corporations liquidated. In 1940 the supplemental indenture was executed, referred to in detail in our findings, providing for *55 extension of the maturity of the notes to 1948, the payment of $10,000 monthly on the principal and interest of the notes, the reduction of the interest rate to 5%, and the giving of additional security by way of chattel mortgages. Apparently petitioner's subsidiary corporations reported no gain or loss arising from the sales of the newspapers by them in 1932. Petitioner reported no gain arising from the liquidation of its subsidiaries in 1932 or 1933. In the stipulation of facts it is recited: The Revenue Agent's report for 1932 with respect to this item is as follows, which report was agreed to by the Petitioner: The Brush-Moore Newspapers, Inc. owned all the capital stock of the following corporations: The Lorain Times Herald Co., Lorain, Ohio; The News Printing Co., Mansfield, Ohio. The capital stock of the last two corporations named above was acquired on January 3, 1932. Certain of the assets of those corporations were sold in December, 1932, and the corporations proceeded to liquidate, the liquidation being completed in 1933. The sale price was represented entirely by notes, which apparently have no value, therefore no profit is being set up in the year 1932. The *56 eventual profit to be realized by the Brush-Moore Newspapers, Inc. upon the payment of the notes is computed as follows: Notes received
$800,000.00
Total assets 12/31/32 of News Prtg. Co. (Exh. A)
49,330.07
Lorain Times-Herald Co. (Exh. A)
27,879.72
Total
$877,209.79
Less: Liabilities 12/31/32 News Prtg. Co.
$1,907.91
Lorain Times-Herald Co.
355.02
2,262.93
Net amount to be received in final liquidation of subsidiaries
$874,946.86
Cost of stock of News Prtg. Co. and Lorain Times-Herald Co. per
Exhibit FF
$781,625.00
Add: Open Accounts - News Prtg. Co.
75,319.35
Lorain T-H Co.
103,107.84
$960,052.19
Less: Losses sustained by subsidiaries and allowed in con-
solidated return: News Prtg. Co.
$ 78,383.18
Lorain T-H Co.
107,516.59
185,899.77
774,152.42
Profit to be realized
$100,794.44
Under date of January 30, 1942, the internal revenue agent in charge made a report with regard to petitioner's income tax liability for the year 1940 which contained the following statement: (C) In 1932 the Mansfield News Printing Company and the Lorain-Herald Company, subsidiaries of the taxpayer, sold all of *57 their assets and the companies were liquidated. See revenue agent's report covering the year 1932. In the consummating of this sale and liquidations the taxpayer received notes of the Mansfield Journal Company in the amount of $800,000.00 which notes bore interest at the rate of 6% and were due December 27, 1940, in connection with which an unrealized profit of $100,794.44 was set up to be returned upon the payment of the notes. The maturity of the notes as extended to on or before April 1, 1948, by supplemental indenture dated April 12, 1940, providing for the payment of $10,000.00 per month beginning October 31, 1940, and reduction in the interest rate to 5% per annum. Payments were made to December 31, 1940, in the amount of $200,000.00. G.C.M. 22056 Cumulative Bulletin 1940-2, page 189, stated in part as follows: It is realized that there may be cases where material changes in the terms of an outstanding bond are made by indorsement of such changes on the existing bond rather than by the issuance of a new one. Where the changes are so material as to amount to the issuance of a new security, the same income tax consequences should follow as if the new security *58 were actually issued. In this case the supplemental indenture of August 12, 1940 changing the maturity date, the interest rate, and the manner of payment of the notes, was so material as to amount to the issuance of new notes. Thus, the notes due in 1940 were discharged resulting in the realization of the unrealized profits set up upon the receipt of the notes in 1932. The unrealized profit is accordingly being included in income for the year 1940 as having been realized in that year. Upon receipt of this report petitioner paid the additional income tax shown due thereon. Under date of April 9, 1945 respondent determined a deficiency in petitioner's excess profits tax liability, including in its excess profits net income for 1940 the amount of $100,794.44 as "realized profit". In his explanation attached is the following statement: In your returns, Forms 1120 and 1121, for the year 1940 you failed to include in taxable income the amount of $100,794.44 representing net profit realized in 1940 on certain notes in the face amount of $800,000.00 received by you in 1932 as sole stockholder in liquidation of The News Printing Co. and The Lorain Times-Herald Co. You contended that *59 no taxable gain was realized in 1932 since the notes did not have a fair market value. You contention was allowed and you agreed that the profit would be taxable when realized. It is held that the profit of $100,794.44 is taxable for the year 1940 under the provisions of Sec. 22(a) of the Internal Revenue Code. It is further held that no part of the profit realized constituted abnormal income under the provisions of Sec. 721 of the Internal Revenue Code. Neither party to this proceeding has adequately considered the question whether gain or loss resulted to the subsidiary corporations from the sales in 1932 under section 111, Revenue Act of 1932, or to petitioner upon liquidation of the subsidiaries in 1932 or 1933, under section 115 of the same Act. Both parties have argued this issue apparently upon the hypothesis stated in respondent's brief as follows: "Due to the additional security and the material changes made relative to the obligation, respondent determined that the notes were in effect satisfied in 1940 * * *." Petitioner, as we have pointed out, in effect contends that any gain resulting from the 1940 transaction was a long-term *60 capital gain, or was abnormal to it, and therefore not includible in its excess profits tax net income. Respondent denies that it was abnormal, but does not deny that the gain resulting from the 1940 transaction was capital gain. He contends merely that it was not a longterm capital gain and therefore not covered by section 711 (a) (1) (B) of the Internal Revenue Code. [2]
In view of the attitude taken by the parties with regard to this issue, we refrain from passing on the question *61 whether any taxable gain or loss resulted to petitioner in 1940. We are able to so refrain because even though we assume that gain resulted from the 1940 transaction, it must be considered on the facts and record before us as a longterm capital gain. The notes in question were capital assets of petitioner as defined in section 117(a) of the Internal Revenue Code. [3] They were registered notes and therefore their retirement would be covered by section 117 (f). [4] Thus, if the 1940 transaction resulted in a gain, it was a capital gain. *62 Respondent contends, however, that it was not a long-term capital gain. Since his argument on this issue is set forth in only one paragraph in his brief, we set it out in full rather than attempt to paraphrase it. Petitioner purchased all of the stock of the two newspaper corporations in January 1932 and approximately twelve months later liquidated these two newspaper corporations and petitioner received notes in lieu of its stock of the subsidiary corporations. Therefore, petitioner received the notes for its stock upon liquidation, approximately one year from the date of acquiring such stock. There is nothing in the evidence indicating that the stock of the subsidiary corporation was held for a period of more than approximately one year. (Stip. Par. B) The pertinent law, as applicable to either 1940 or 1932, requires that the property must be held at least for a period of more than eighteen months. It is very evident that the facts in the instant case do not warrant any amount in issue being excluded under authority of Section 711. The only period of holding that can be considered is the period that the stock was held. This is a well accepted principle of law as established in *63 the case of Henry H. Rogers Estate, et al. v. Commissioner, (CCA-2, 1944) 143 Fed. (2d) 695, cert. den. (1944) 323 U.S. 780, 65 S. Ct. 269. Certainly under the authority of the Rogers Estate case, supra, petitioner cannot say that the period of holding the notes is to be counted in determining whether Section 711 applies. It is felt that the facts and law are so apparent that it is not advisable to discuss further petitioner's position relative to any amount being excluded under Section 711. An examination of the case cited, and our own opinion therein, reported as Estate of Henry H. Rogers, 1 T.C. 629, indicates that we were there considering a situation in which executors had sold property of an estate and had taken, as part of the purchase price, installment obligations of the purchaser which were later distributed to testamentary trusts. It was held in that case that because of the provisions of section 44 (d) of the Revenue Act of 1934, read in the light of its legislative history, the period of holding under section 117, in cases where the profit on the sale of property is returned on the installment basis, should be the period for *64 which the original property sold was held, rather than the period for which the installment obligations were held. In the instant case it should be noted that petitioner made no sale of its property in return for the installment obligations of any purchaser thereof. If it had sold its own stock, held as treasury stock, to a purchaser in return for the purchaser's installment obligations, then the period of holding the stock sold would be important in determining whether gain resulting from the retirement of the purchaser's installment obligations constituted a long-term capital gain. In such a case Rogers Estate v. Commissioner, supra, would be pertinent. However, in the instant case the period of the holding by petitioner of stock in its subsidiaries is immaterial. The subsidiaries were liquidated in 1933. From that period until 1940 it held the notes in question. These were not installment notes given to it by any purchaser of its stock as part of the purchase price of the stock. Therefore, in the instant case Rogers Estate v. Commissioner, supra, is not helpful. We conclude that any gain realized by petitioner in 1940 upon the retirement of the notes *65 in question was a long-term capital gain. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(p) Pension Trusts. - (1) General Rule. - An employer establishing or maintaining a pension trust to provide for the payment of reasonable pensions to his employees shall be allowed as a deduction (in addition to the contributions to such trust during the taxable year to cover the pension liability accruing during the year, allowed as a deduction under subsection (a) of this section) a reasonable amount transferred or paid into such trust during the taxable year in excess of such contributions, but only if such amount (1) has not theretofore been allowable as a deduction, and (2) is apportioned in equal parts over a period of ten consecutive years beginning with the year in which the transfer or payment is made. * * *
(3) Exemption of Trusts Under Section 165. - The provisions of paragraphs (1) and (2) of this subsection shall be subject to the qualification that the deduction under either paragraph shall be allowable only with respect to a taxable year (whether the year of the transfer or payment or a subsequent year) of the employer ending within or with a taxable year of the trust with respect to which the trust is exempt from tax under section 165. Regulations 103. Sec. 19.23(p)-1. Payments to employees' pension trusts. - An employer who adopts or has adopted a reasonable pension plan, actuarially sound, and who established, or has established, an maintains a pension trust for the payment of reasonable pensions to his employees (if the trust is exempt from tax under section 165, relating to trusts created for the exclusive benefit of employees) shall be allowed to deduct from gross income reasonable amounts paid to such trust, in accordance with the pension plan (including any reasonable amendment thereof), as follows: (a) If the plan contemplates the payment to the trust, in advance of the time when pensions are granted, of amounts to provide for future pension payments, then (1) reasonable amounts paid to the trust during the taxable year representing the pension liability applicable to such year, determined in accordance with the plan, shall be allowed as a deduction for such year as an ordinary and necessary business expense, and in addition (2) one-tenth of a reasonable amount transferred or paid to the trust during the taxable year to cover in whole or in part the pension liability applicable to the years prior to the taxable year, or so transferred or paid to place the trust on a sound financial basis, shall be allowed as a deduction for the taxable year and for each of the nine succeeding taxable years. (b) * * * Deductions under section 23(p) of the Internal Revenue Code or under a similar section of a prior Revenue Act and apportioned to any taxable year beginning after December 31, 1937, shall be allowable only with respect to a taxable year (whether the year of the transfer or payment or a subsequent year) of the employer which ends with or within a taxable year of the trust with respect to which the trust is exempt from tax under section 165. As to what constitutes an exempt employees' trust, see section 19.165-1. If any portion of the funds of an exempt pension trust reverts to the possession, ownership, or control of the employer by reason of the termination of the trust or otherwise, such amount (except to the extent that it represents a payment to the pension trust made by the employer in accordance with the pension plan and pursuant to the first paragraph of this section, and not theretofore allowed as a deducion to the employer) shall be returned as income by the employer for the taxable year in which it so reverts, unless prior to the close of such year it shall again be placed in trust for the benefit of employees under provisions satisfactory to the Commissioner. Reasonable payments made by an employer during the taxable year directly to pensioners on account of pensions in respect of which no payment has been made to a pension trust shall be allowed as a deduction from gross income for such year as an ordinary and necessary business expense. * * *
Internal Revenue Code. SEC. 165. EMPLOYEES' TRUSTS. A trust, forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of some or all of his employees - (1) if contributions are made to the trust by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, and (2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees, shall not be taxable under section 161, * * *. Regulations 103. Sec. 19-165-1. Employees' trusts. - (As amended by Treasury Decision 4973, C.B. 1940-1, p. 65): (a) Plans and trust for employees. - A "stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of some or all of his employees" is a definite written program and arrangement communicated to such employees, solely designed and applied to enable such employees to share in the capital or profits of such employer's trade or business or to provide for the livelihood of such employees upon their retirement from employment. A "trust forming part of a stock bonus, pension, or profit-sharing plan" is a trust formed and availed of solely to aid in the proper execution of one of the plans defined in the preceding sentence. This phrase includes only trusts created for the exclusive benefit of employees, and does not include devices for distributing profits to shareholders. All the surrounding and attending circumstances and the details of the plan will be indicative of whether it is a bona fide stock bonus, pension, or profit-sharing plan for the exclusive benefit of employees within the meaning of section 165. (b) Taxable years beginning prior to January 1, 1940. - A trust forming part of a plan defined in paragraph (a) is exempt for taxable years beginning prior to January 1, 1940, if: (1) contributions are made to the trust by such employer, such employees, or both; and (2) such contributions are made for the purpose of distributing to such employees both the earnings and principal of the fund accumulated by the trust; and (3) the fund is accumulated by the trust in accordance with the plan of which the trust is a part. (c) Taxable years beginning after December 31, 1939. - A trust forming part of a plan defined in paragraph (a) is exempt for taxable years beginning after December 31, 1939, if all three tests designated in paragraph (b) as (1), (2), and (3) are met; and if also (4) the trust instrument makes it impossible (in the taxable year and at any time thereafter prior to the satisfaction of all liabilities to employees covered by the trust) for any part of the trust corpus or income to be used for, or diverted to purposes other than for the exclusive benefit of such employees. (d) Impossibility of diversion. - As used in section 165(a)(2), the phrase "if under the trust instrument it is impossible" means that the trust instrument must definitely and affirmatively make it impossible for the non-exempt diversion or use to occur, whether by operation or natural termination of the trust, by power of revocation or amendment, by the happening of a contingency, by collateral arrangement, or by any other means. It is not essential that the employer relinquish all power to modify or terminate the rights of certain employees covered by the trust, but except as stated in paragraph (e), it must be impossible for trust funds to be used or diverted for purposes other than for the exclusive benefit of his employees. The diversion of substantial amounts of trust funds from one group of employees to another group of employees is not for the "exclusive" benefit of employees even though both groups were covered by the trust, if the employer (or other non-employee) receives substantial indirect benefit thereby, as for example, through securing greater loyalty from the favored group, as through the shifting of expected pension benefits to a younger group and the postponement of part of the employer's contributions to a later date. As used in section 165(a)(2), the phrase "purposes other than for the exclusive benefit of his employees" includes all objects or aims not solely designed for the proper satisfaction of all liabilities to employees covered by the trust. (e) Meaning of "liabilities". - The report of the Senate Committee on Finance on the Revenue Act of 1938 states that the intent and purpose in section 165(a)(2) thereof (which is identical to section 165(a)(2) of the Internal Revenue Code) of the phrase "prior to the satisfaction of all liabilities with respect to employees under the trust" is to permit the employer to reserve the right to recover only such balance in the trust at its termination as is "due to erroneous actuarial computations during the previous life of the trust." An "erroneous actuarial computation" means a mistake of an actuarial character reasonably made by a careful person skilled in calculating the amount necessary to satisfy pecuniary obligations depending on the average length of life of a group of individuals, and of such a type that the employer may reserve the right to recover an amount remaining in the trust because of the mistake without conflicting with the purpose for which section 165(a)(2)↩ was enacted. * * *.
2. SEC. 711. EXCESS PROFITS NET INCOME. (a) Taxable Years Beginning After December 31, 1939. - The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13(a)(2), for such year except that the following adjustments shall be made: (1) Excess Profits Credit Computed Under Income Credit. - If the excess profits credit is computed under section 713, the adjustments shall be as follows: * * * *
(B) Long-Term Gains and Losses. - There shall be excluded long-term capital gains and losses. * * *↩
3. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1)↩; 4. * * * (f) Retirement of Bonds, Etc. - For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.↩